UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 006-6273-CR-HUCK/BROWN

UNITED STATES OF AMERICA,

      PLAINTIFF,

v.

ANTHONY TRENTACOSTA, et al.,

      DEFENDANTS.

_____/

## GOVERNMENT'S RESPONSE TO DEFENDANT SILVERMAN'S MOTION TO SUPPRESS STATEMENTS

COMES NOW the United States of America, by and through the undersigned Assistant United States Attorney, and files this Response in opposition to defendant Silverman's Motion to Suppress Statements (DE 229).

In his Motion, the defendant urges this Court to suppress two statements which he made to law enforcement agents. The first was a sworn taped statement given by the defendant on April 22, 1999 to Detectives Frank Ilarraza and Don Devine of the Broward Sheriff's Office.[1] The second was an oral statement given by the defendant on September 27, 2000 to F.B.I. Special Agents William Howe Grover, Kevin C. Rentzel and Celeste Van Auken following the defendant's arrest in the instant case. The defendant seeks to have both statements suppressed, asserting, as his sole ground, that when each of the statements was taken, he was under the influence of alcohol and/or drugs to such an extent as to render the statements involuntary.

---

[1]As set forth hereinbelow, at the time this statement was given, the defendant was not under arrest for any offense.



FACTS

On March 28, 1999, Ariel Hernandez was arrested pursuant to a State of Florida warrant and charged with the murder of Jeanette Smith.[2] In his post-arrest statement, Hernandez ultimately stated that he had accidently caused the death of Ms. Smith during a sexual encounter. Hernandez thereafter stated the following: Once he realized that Ms. Smith was dead, he called Frederick J. Massaro for help. Massaro responded to the scene of the homicide, and stated that he would have the instant defendant, Adam Todd Silverman, a/k/a/ "Sonny," come over with a truck so that they could dispose of the body. When Sonny arrived with the truck, they loaded the body of Ms. Smith into a box and ripped the labels off the box so that it could not be traced. Thereupon, they loaded the box into the truck, and Hernandez, the defendant Silverman and a third individual whom Hernandez knew only as "Joe" drove the truck out to the everglades, where they disposed of the box containing Ms. Smith's body. Afterwards, they disposed of Ms. Smith's belongings at a nearby rest area.[3]

On April 21, 1999, Det. Ilarraza contacted the defendant Silverman by telephone and stated that he wished to speak to Silverman. Silverman agreed to meet with Det. Ilarraza the next day. On April 22, 1999 at approximately 9:40 A.M., Detectives Ilarraza and Devine met Silverman at his

---

[2]The facts which form the basis for this charge are the same facts which underlie the RICO murder charges in Counts 17-19 of the pending indictment.

[3]In subsequent statements, Hernandez changed many of the details concerning the homicide, asserting that Smith was actually murdered by persons known only as "Enrique" and "Francisco," and maintaining that he, Massaro and "Joe" actually disposed of the body. In each version, however, Hernandez maintained that defendant Silverman had some role in removing the body of Ms. Smith from the homicide scene and/or disposing of Ms. Smith's belongings after the homicide had been committed. Moreover, intercepted telephone conversations of Silverman and others established that Silverman participated in the disposal of Ms. Smith's body and her belongings following her murder.

place of business, King Group International.[4]   Thereupon, Silverman agreed to accompany the

detectives to the Broward Sheriff's Office to be interviewed. At the Sheriff's Office, Silverman was

advised that he was not under arrest and that he was free to go at any time. Silverman then gave a

sworn taped statement to Detectives Ilarraza and Devine. A transcript of that statement is attached

hereto and incorporated herein as Attachment A.[5]  After the statement was concluded, Detectives

Ilarraza and Devine drove Silverman back to his place of business. At no time did Silverman appear,

through his words or actions, to be under the influence of any substance.[6]

On September 19, 2000, the instant indictment was returned charging the defendant

Silverman and eight co-defendants with RICO conspiracy and various other crimes. Among the

charges against Silverman is Count 19, which charges him with being an accessory after the fact to

the aforesaid murder of Jeanette Smith. The indictment, and the accompanying arrest warrants, were

---

[4]Significantly, the evidence establishes that, prior to meeting with the detectives on the morning of April 22, 1999, Silverman placed a telephone call to Massaro and stated that he urgently needed to speak with Massaro. Thereupon, Silverman drove to Massaro's residence. While at Massaro's residence, Silverman placed a telephone call to his boss, Jacob Werba, and discussed Ariel Hernandez.

[5]The transcript corroborates the fact that Silverman voluntarily accompanied the detectives to the Sheriff's office and voluntarily agreed to give the statement. In the transcript, at pages 10-11, Silverman acknowledged that he had spoken to Det. Ilarraza on the telephone the previous day, that he accompanied the detectives on his own, and that he understood that he was free to go at any time. Moreover, Silverman gave consent to have oral swabs taken from him. Consequently, it is beyond dispute that, when he agreed to render this statement, the defendant was not under any form of restraint. "In contrast to the presumption of coercion that attends statements given during custodial interrogation in the absence of *Miranda* warnings, statements made during a noncustodial interrogation are not viewed with suspicion." United States v. Serlin, 707 F.2d 953, 958 (7th Cir. 1983). See also, California v. Beheler, 463 U.S. 1121, 1125 (1983); Oregon v. Mathiason, 429 U.S. 492, 493 (1977).

[6]Following his return to his place of business, Silverman placed a telephone call to Massaro and outlined for Massaro the details of his interview with the Broward Sheriff's Office detectives.

3

sealed by the court. On September 26, 2000, following the arrests of defendants Anthony Trentacosta, Frederick J. Massaro, Julius Bruce Chiusano, Anthony Raymond Banks and Charles Patrick Monico, the indictment was unsealed. On that date, law enforcement agents were unable to physically locate defendant Silverman. However, F.B.I. Special Agent Kevin Rentzel and Detective Warren Emerson of the Broward County Sheriff's Office, utilizing Silverman's digital pager, were able to establish telephone contact with him on September 27, 1999 at approximately 11:00 a.m. During several telephone conversations, Agent Rentzel and Det. Emerson consistently advised Silverman that there was an outstanding arrest warrant, and that Silverman was required to surrender himself to law enforcement authorities. Silverman stated that he would do so. Ultimately, at approximately 4:30 p.m., Silverman advised by telephone that he was en route to his girlfriend's home in North Miami, Florida, and that he would meet the law enforcement agents there at 6:00 p.m. On September 27, 2000 at approximately 6:00 p.m., Agent Rentzel and other law enforcement agents met Silverman at his girlfriend's home in conformity with the aforesaid arrangements and arrested him.[7] Silverman was taken to the F.B.I. office for processing. While there, Silverman was provided with an Advice of Rights Form, which he signed and acknowledged, waiving his rights to remain silent and to have an attorney present.[8] Thereupon, Silverman gave a statement to F.B.I. Agents Rentzel, Grover and Van Auken. A report outlining what Silverman said during that statement is

---

[7] The true facts completely contradict the defendant's assertions at page 2 of his Motion, where he states that "[a]t the time of his arrest at his residence, he had recently awoken from a deep drug and alcohol induced sleep. In this unstable state of mind, the Defendant was whisked away to the FBI office, confronted with the allegations against him and influenced to give a statement."

[8] A copy of that advice of rights form is attached hereto and incorporated herein as Attachment B.

attached hereto and incorporated herein as Attachment C. During the arrest and statement described above, Silverman did not appear, through his words or actions, to be under the influence of any substance.

## ARGUMENT

The defendant claims that, on two separate occasions, seventeen months apart, when he agreed to speak to law enforcement agents concerning his role in the aftermath of a murder, he was under the influence of "drugs and/or alcohol." In deciding this issue, this Court may examine the statements themselves in determining their voluntariness. A review of these statements establishes that the defendant was cogent, articulate and largely consistent in his two renditions of his involvement in the aftermath of the homicide.[9] Therefore, the statements themselves establish that the defendant was not impaired at the time he gave them, and corroborate the fact that the agents and officers involved in these two interactions with Silverman witnessed no evidence of any such impairment. Furthermore, the circumstances surrounding the taking of these statements (i.e. the reports which the defendant made to co-defendant Massaro both before and after the April 22, 1999 statement, and the arrangements which the defendant made to surrender prior to the September 27, 2000 statement) vitiate any suggestion by the defendant that he was impaired.

Moreover, the defendant's motion is insufficient as a matter of law. Even assuming, arguendo, that the defendant was under the influence of some substance, in the absence of police misconduct or over-reaching, he is still not entitled to relief. In Colorado v. Connelly, 479 U.S. 157

---

[9]During the defendant's statements, he denies any culpability in the offense and makes several claims which are provably untrue. It is clear that the defendant's intention, in speaking with the agents and detectives, was to attempt to extricate himself from criminal responsibility. Therefore, the government anticipates offering these statements at trial as false exculpatory statements.

(1986), the Court set forth the rule with regard to alleged mental impairments and the voluntariness

of statements to the police:

> The sole concern of the Fifth Amendment, on which *Miranda* was
> based, is governmental coercion. See *United States v. Washington*,
> 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977);
> *Miranda, supra*, 384 U.S., at 460, 86 S.Ct., at 1620. Indeed, the Fifth
> Amendment privilege is not concerned "with moral and psychological
> pressures to confess emanating from sources other than official
> coercion." *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285,
> 1290, 84 L.Ed.2d 222 (1985). The voluntariness of a waiver of this
> privilege has always depended on the absence of police overreaching,
> not on "free choice" in any broader sense of the word. See *Moran v.
> Burbine*, 475 U.S., at 421, 106 S.Ct., at 1141 ("[T]he relinquishment
> of the right must have been voluntary in the sense that it was the
> product of a free and deliberate choice rather than intimidation,
> coercion or deception ... [T]he record is devoid of any suggestion that
> police resorted to physical or psychological pressure to elicit the
> statements"); *Fare v. Michael C.*, 442 U.S. 707, 726-727, 99 S.Ct.
> 2560, 2572-2573, 61 L.Ed.2d 197 (1979) (The defendant was "not
> worn down by improper interrogation tactics or lengthy questioning
> or by trickery or deceit ... The officers did not intimidate or threaten
> respondent in any way. Their questioning was restrained and free
> from the abuses that so concerned the Court in *Miranda*").
>
> Respondent urges this Court to adopt his "free will" rationale,
> and to find an attempted waiver invalid whenever the defendant feels
> compelled to waive his rights by reason of any compulsion, even if
> the compulsion does not flow from the police. But such a treatment
> of the waiver issue would "cut this Court's holding in [*Miranda*]
> completely loose from its own explicitly stated rationale." *Beckwith
> v. United States*, 425 U.S. 341, 345, 96 S.Ct. 1612, 1615, 48 L.Ed.2d
> 1 (1976). *Miranda* protects defendant's against government coercion
> leading them to surrender rights protected by the Fifth Amendment;
> it goes no further than that. Respondent's perception of coercion
> flowing from the "voice of God," however important or significant
> such a perception may be in other disciplines, is a matter to which the
> United States Constitution does not speak.

Id. at 170-171. Similarly, in the case at bar, the defendant's Motion barely asserts that, because of

his alleged impairment due to "alcohol and/or drugs," the defendant was incapable of giving a

6

voluntary statement on April 22, 1999 or understanding and waiving his rights on September 27, 2000. The defendant does not, and cannot, allege any misconduct on the part of the police or agents in acquiring these statements. Consequently, the defendant's Motion is insufficient as a matter of law, and he is therefore not entitled to relief. Under virtually identical circumstances, the Eleventh Circuit held that a defendant is not entitled to a hearing on the issue of voluntariness:

> Scheigert [the defendant] contends that his confession to federal agents was involuntary because he suffered from a mental defect and chronic drug addiction and alcoholism. He contends that the trial court erred because it did not hold a full hearing as required by *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), in order to determine the voluntariness of his confession. Instead, the trial court, in determining that Scheigert was mentally competent and that his confession was voluntary, relied in part upon the written report of a government psychiatrist. We agree that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of voluntariness before his confession is allowed to be heard by the guilt determining jury. However, "appellant is not entitled to this remedy unless he can show 'that his version of events, if true, would require the conclusion that his confession was involuntary;' *i.e.*, he must allege *facts* which would, if proven true, indicate the involuntariness of his confession." *United States v. Davidson*, 768 F.2d 1266, 1270 (11th Cir. 1985) (quoting *Procunier v. Atchley*, 400 U.S. 446, 451, 91 S.Ct. 485, 488, 27 L.Ed.2d 524 (1971)) (emphasis in original).
>
> Here it is plain that Scheigert has alleged no facts which would indicate the involuntariness of his confession. We may assume, for purposes of this decision, that Scheigert was in fact mentally impaired and his confession was the product of that defect and his drug addiction and alcoholism. However, as the Supreme Court has recently concluded, "coercive police activity is a necessary predicate to finding that a confession is not 'voluntary.'" *See Colorado v. Connelly* ... Consequently, in the absence of coercive police activity, the mental defect and substance dependency of which Scheigert complains cannot render his confession involuntary. It follows, *a fortiori*, that Scheigert was not entitled to a *Jackson v. Denno* hearing.

<u>United States v. Scheigert</u>, 809 F.2d 1532, 1533 (11th Cir. 1987).

WHEREFORE, the government respectfully requests, based upon the above and foregoing, that the Court summarily deny the defendant Silverman's Motion to Suppress Statements.

Respectfully submitted,

GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
LAWRENCE D. LaVECCHIO
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 305405
299 East Broward Boulevard
Fort Lauderdale, Florida 33394
954/356-7255/ 356-7230 - fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was delivered by U.S. mail to the following on this 14th day of June 2001.

Richard K. Houlihan, Esq. **(for Anthony Trentacosta)**
300 Aragon Avenue, Ste. 310
Coral Gables, Florida 33134

William D. Matthewman, Esq. **(for Ariel Hernandez)**
2300 Glades Rd., Suite 340 - West Tower
Boca Raton, Florida 33431

Fred Haddad, Esq. **(for Frederick J. Massaro)**
One Financial Plaza, Suite 2612
Fort Lauderdale, Florida 33394

Christopher A. Grillo, Esq. **(for Frederick J. Massaro)**
1 East Broward Blvd., #700
Ft. Lauderdale, Florida 33301

Samuel D. DeLuca, Esq. **(for Francis Ruggiero)**
3451 John F. Kennedy Blvd.
Jersey City, New Jersey 07307

Jeffrey Weinkle, Esquire **(for Ariel Hernandez)**
1035 NW 11th Avenue
Miami, Florida 33136

Donald Spadaro, Esquire **(for Julius B. Chiusano)**
1000 S. Federal Highway, Suite 103
Fort Lauderdale, Florida 33316

Michael G. Smith, Esquire **(for Adam Todd Silverman)**
633 SE 3rd Avenue, Suite 4F
Fort Lauderdale, Florida 33301

Albert Z. Levin, Esquire **(for Carlos Garcia)**
888 Brickell Avenue, Sixth Floor
Miami, Florida 33131

Thomas Almon **(for Charles P. Monico)**
321 NE 26th Street
Miami, Florida 33137

Manuel Gonzalez, Esquire **(for Anthony R. Banks)**
782 NW Le Jeune Road, Suite 440
Miami, Florida 33126

LAWRENCE D. LaVECCHIO
Assistant United States Attorney

STATEMENT OF:  ADAM TODD SILVERMAN 

Following will be a sworn taped statement taken by Detective Frank
Ilarraza of the Broward County Sheriff's Office. This will be in
reference to Broward Sheriff's Office case number BS99-3-11083
which has been classified as a HOMICIDE, the death investigation of
Jeanette Smith whose body was found on March 21st, 1999, at the 31
Mile Marker of Alligator Alley. Today's date is April 22nd, 1999.
The time now is approximately 11:48 according to my wrist watch.
We are currently located at the Broward Sheriff's Office Criminal
Investigations Division Interview Room where I'll be taking a
statement from a white male by the name of Adam Todd Silverman.
Also present for this statement is Detective Don Devine.


Q    Mr. Silverman, do you understand we're police officers
     investigating this case?
A    Yes, sir.

Q    As police officers in the State of Florida, we have the
     authority to take sworn statements. Therefore everything you
     tell me must be the truth. Do you understand what the word
     perjury means?
A    Yes, I do.

Q    You swear to tell the truth.  If you lie, you're committing a
     crime.
A    Yes.

Q    Could you raise your right hand?
A    Yes.

Q    Do you swear to tell the truth, the whole truth, and nothing
     but the truth so help you God?


/jo                           1  of 11

ATTACHMENT A

STATEMENT OF:  ADAM TODD SILVERMAN                

A    Yes, I do.

Q    Okay, let the record reflect that Mr. Silverman has raised his
     right hand and has been sworn in. Ah, could you tell me your
     name and date of birth?
A    Adam Todd Silverman,

Q    And what's your address?
A    7/06/67.

Q    Okay, and what's your current address?
A    100 Kings Point Drive.

Q    Okay, apartment?
A    802.

Q    Do you have a telephone number there?
A    944-6551, area code 305.

Q    And who do you reside with?
A    Ah, Melissa (unintelligible)

Q    Okay.
A    But we are in the process of moving right now, so that's going
     to be changing.

Q    Okay, and what is her relationship to you?
A    Just a roommate.

Q    Okay, ah, where do you work at?
A    Ah, I basically work for myself for a company called World
     Transit Distributors.  I have a broker at King Group
     International.

Q    Okay.
A    Selling heavy machinery and transportation around the world.

/jo                        2  of 11

STATEMENT OF:  ADAM TODD SILVERMAN



Q    All right, going back to this ah, investigation of this young
     girl that was killed, ah, we were discussing the day of
     Saturday the 20th, when we know or we figure that's when she
     was killed on or about that date. Ah, you were telling us that
     there came a point that Saturday when you were at Beachside
     Mario's is it?
A    Yeah.

Q    Okay, would you tell me what happened from that point on?
     About what time you were there?
A    Approximately, approximately give or take 7:00 P.M.

Q    Okay.
A    Maybe 6:30.

Q    And what happened?
A    I ran into Ariel. He..

Q    Who do you know Ariel as?
A    Ariel.

Q    Do you know his last name?
A    No.

Q    Okay, is he the person who was arrested for in connection to
     her death?
A    According to the news, yes.

Q    Okay, did you see his picture in the paper?
A    In the news.

Q    Okay, is that the same person that was referring to?
A    Yes, sir.

Q    Okay, so that same person, Ariel, showed up at Beachside
     Mario's and what did he want?

STATEMENT OF:  ADAM TODD SILVERMAN                    ▬▬▬▬▬▬▬▬

A    He wanted to borrow my truck, not my truck, but a truck that
     was loaned to me by someone else.

Q    And what type of truck is it?
A    A blue Mazda Naraho, Navaho?

Q    Navaho?
A    Yeah.

Q    Okay, who does that truck belong to?
A    Oleg, O L E G, Klets, K L E T S.

Q    Okay.
A    A Russian colleague of mine who resides in Kazakhstan, Russia.

Q    But you at the time were using the truck?
A    I was using the truck for approximately two and a half weeks.

Q    Okay, so he shows up and wants to borrow the truck, what
     happens then?
A    He took me to a motel hotel room where I waited for him
     outside. While I was doing so, he loaded up two large boxes
     and two small boxes.

Q    Okay, you were describing one of the boxes as having duct
     tape. Which was that box?
A    The gray tape?

Q    The gray tape, yes.
A    Yes.

Q    Okay.  Do you remember which box that was?
A    It was the box that I saw in the news.

Q    The same box that you saw on the news, okay.  ah, Did he load
     up that box himself or did you load it?

STATEMENT OF:  ADAM TODD SILVERMAN          

A    He loaded it himself.

Q    Okay, now I know he has ah, his right hand is broken. He's got
     an injury to his right hand?
A    Are you sure about that?

Q    Well, I saw...
A    Cause he used to wear a cast all the time.

Q    Why?
A    Just for the hell of it.

Q    Okay, have you, have you seen him using that hand?
A    Of course.

Q    Okay, so you're telling me that he can use that hand then?
A    Yes, very well.

Q    How long has he had that injury?
A    I don't even know if he ever had an injury. He just likes to
     wear the cast for attention and whatnot.

Q    Well, it does look he has a bone or something protruding from
     the top of his hand there?
A    His hand is fine.

Q    Well, I mean, if you look at it, I'm telling you you see that?
A    But he uses it just fine.

Q    So he uses his hand fine?
A    Just fine.

Q    Okay, so he had no problem lifting the box then?
A    He did it all himself. He turned a bit red, but he did it all
     himself.

STATEMENT OF:  ADAM TODD SILVERMAN 

Q    Did it seem kind of unusual that you know, that that box was
     that heavy to you at the time?
A    Yes, it did.

Q    What did you think was in—it?
A    I didn't know.  I asked him.   He said it was none of my
     business, don't worry about it.

Q    Okay, what happens next then?  You throw the boxes into the
     Navajo and what happens?
A    He loaded the boxes into the Navajo and then he asked me to
     follow him cause he had to drop off a car of his that he had
     just got at a friend at his house.

Q    And before did he, did he take you to the car? Did you guys go
     to the car?
A    Yeah, he showed me the car.

Q    What did this car look like?
A    It was like I said it was either black or dark green, I was
     (unintelligible) Mazda 626, I thought it was a Lexus.

Q    Where was it parked at?
A    Ah, one or two motels over. The Day's Inn used to be the
     Riveria.

Q    Okay, when he took you to the car, what did he do with the
     car?
A    He opened it up. We went inside and he was going through the
     car.

Q    Okay, what was he doing?  Was he removing anything from the
     car?
A    It appeared to me.

STATEMENT OF:  ADAM TODD SILVERMAN          

Q    Okay, what was he doing with the stuff that was in the car?
A    Well, he didn't remove much.  He removed some ah, small items,
     small items like you said, I believe a C.D. case or a pair of
     glasses.

Q    Did he offer you the glasses?
A    Yes.

Q    What did the glasses look like?   Sunglasses you mean?
A    I believe so.

Q    Okay.
A    I believe they were gold rimmed.

Q    Did he, the C.D. case, what did it look like?
A    Ah, I don't know it was kind of roundish with a black zipper,
     I think.

Q    Do you know what he did with those?
A    No, I don't.

Q    So you don't know what he did with that case then? Did he put
     any of those items inside the truck?
A    I don't remember. I really don't remember.

Q    You don't remember if he took any of the items from the car
     and put them in the trunk?
A    He might have kept them on his person, I'm I'm not sure.

Q    Any like luggage or back packs?
A    Ah, I didn't see any luggage.

Q    Okay, what did he do with the car then? Did he make any
     comments about the car or who it belonged to?
A    Yeah, he says it was his car now and that he had to take it
     and just drop it at a friend's house.

STATEMENT OF:  ADAM TODD SILVERMAN 

Q    So he made, he said it was his car now?
A    Yeah, something to that effect.

Q    Okay,
A    I can't say verbatim, to the best of knowledge from that night, he did say that he obtained this car in some way. He says, this is my car now.

Q    Okay.
A    What do you think, bragging, boasting about it.

Q    So did you then follow him to a location or?
A    I followed him to a location.

Q    And where was that at, do you remember?
A    Somewhere around Surfside.

Q    And when you got there, what did he do with the car?
A    He had me park and then he pulled up about two houses up and parked the car and it looked like he was locking it up, like securing it as if it was his own.

Q    Right.
A    And then he got back into the truck and asked me to take me to, have me dropped off. He wanted to drop me off.

Q    And did he drop you off?
A    He dropped me off.

Q    And where was that at?
A    Century Towers.

Q    And what did you do there?
A    I went upstairs and I watched T.V. with my roommate and we might have ordered some food.

STATEMENT OF:  ADAM TODD SILVERMAN          

Q    Okay, did you remain there?
A    For the rest of the night.

Q    Okay, did you later on, you said you had saw the box in the
     news. When you saw it on the news, what did you, what did you
     do?
A    I was in shock.

Q    What did you think happened?
A    Well, I realized what had happened. I realized that ah, I was
     actually driving around with a body that I didn't know about
     and by the time, you, he was already apprehended and from the
     news, he had already confessed to everything. So I didn't
     think there was anything I could help with. Ah, ..

Q    How did you know that was the same box though?
A    Remember what it looked like.  I remember it said Sony and I
     remember the gray tape.

Q    Did you learn later on why he had done this or why he did
     this?
A    No, only from the news when he made a confession about rough
     sex.

Q    Did Freddie ever make any comments to you about Ariel or what
     he had done?
A    No, he had just told me prior to that that he's just bad news
     and that, and even after that that if he should get out, to
     just stay away from him.  He's bad news.

Q    What was it he told you prior to that about?
A    To keep my distance from him.

Q    But as far as the murder itself, what did Freddie tell you
     about it?

STATEMENT OF:  ADAM TODD SILVERMAN          

A    We didn't talk about the murder until after he, he says this
     sick "F", he couldn't believe it.

Q    When you say "F", you mean sick?
A    Sick Fuck.

Q    Okay, who else as far as you know knew about this?
A    Nobody as far as I know, but obviously someone helped him dump
     the body somewhere, so someone had to know, but (inaudible)

Q    Okay, now ah, they call you Sonny, right?
A    That's my nickname. My father's nickname was Sonny. I took it
     on when I was 15, 16 years old.

Q    Okay, now we met you earlier, as a matter of fact I spoke to
     you on the phone yesterday, and we met you earlier and you
     came up with us on your own. Is that correct?
A    Yes, it is.

Q    Okay, and we've told you that you're free to go any time here,
     is that correct?
A    Yes, sir, it is.

Q    Ah, you gave us consent a little while ago to obtain oral
     swabs from you, is that correct?
A    Yes, sir, it is.

Q    And I read the form to you and explained to you what your
     rights were under that, as far as giving up those oral swabs?
A    Yes, sir.

Q    Okay, ah, Okay, and ah, I explained to you before that as soon
     as we conclude this, we're going to be taking you back, is
     that correct?
A    yes, sir.

STATEMENT OF:  ADAM TODD SILVERMAN    

Q   To your employment?
A   Yes, sir.

Q   Okay, and you've ah, you've used the restroom in here, and
were offered a drink of water which you had, is that correct?
A   Yes, sir.

Q   Okay, and I explained to you that the reason the door was
locked is because there's traffic in and out of there and it
makes it more private since we're talking in here about this
incident.  Is that correct?
A   Yes, you do.

Q   All right, Detective Devine, do you have any questions?
Q2  Yeah, you were pretty clear on to the fact that you were able
to come, free to come and go as you wanted?
A   When I got here, yes.

Q2  Okay.

ALL RIGHT, LET THE RECORD REFLECT THAT THIS WILL CONCLUDE AT
12 HOURS AT THIS DATE.

/jo

FD-395 (Rev. 7-13-83)

## INTERROGATION; ADVICE OF RIGHTS

### YOUR RIGHTS

Place _FBI MIAMIS_
Date _9/27/00_
Time _7:00 PM_

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

### WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed _____  9/27

7:00 PM

Witness: _W. Paul Hroe_

Witness: _Celeste Kelo_

Time: _7:00 PM._

ATTACHMENT B

FBI/COJ

FD-302 (Rev. 10-6-95)

*THIS*
*COPY*

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    09/28/2000

On 9/27/00 ADAM TODD SILVERMAN was arrested pursuant to a
Federal Warrant issued in the Southern District of Florida for
violations of Racketeering, Extortionate Collections of an Unlawful
Debt, and Accessory after the Fact as related to the murder of
JEANETTE SMITH. SILVERMAN was processed at the Miami offices of the
Federal Bureau of Investigations, (FBI). SILVERMAN provided the
following: date of birth - 7/6/67; place of birth - Brooklyn, New
York; and Social Security Number 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. SILVERMAN was
provided with his Advise of Rights Form FD-395 and waived his right
to an attorney.  SILVERMAN provided the following information:

SILVERMAN advised he was born in Brooklyn, New York to
IRA and BARBARA SILVERMAN and relocated to South Florida in
approximately 1981 completing his education at the Pompano Beach
High School in 1983. SILVERMAN lived and worked for his divorced
father at his business; M&M Auto Body, 1190 South Dixie Highway,
Pompano Beach Florida. SILVERMAN attempted to further his education
for a short period at the University of Miami before returning to
Kerhonkson, New York where he started HASSLE FREE MOVING COMPANY
which went out of business approximately a year and a half later.
SILVERMAN returned to South Florida and with his partner LINDA
MALEH started the KOSHER KONNECTION an export business he operated
from the 79th Street area of North Miami Beach, Florida.  SILVERMAN
then started ALL INTERNATIONAL another export company located at
Biscayne and 173rd Street Miami, Florida.  SILVERMAN said his
companies exported just about anything from fax machines to
computer games.

SILVERMAN said he then worked as a manager at the
nightclub named "PORKIES" located in Hialeah, Florida. SILVERMAN
said he was hired by an individual named "TARZAN".  SILVERMAN added
he had dated TARZAN's daughter for a period of time.

SILVERMAN then said he was hired by JACKIE WERBA, the
owner of the KING GROUP located on 10th Avenue in Miami, Florida.
SILVERMAN described KING GROUP as a company which deals with the
sale and exportation of heavy construction type equipment and/or
transportation equipment to mostly Eastern European countries.
SILVERMAN was hired as the Vice President of International
Marketing for KING.  SILVERMAN said a PHOEBE SOONG was WERBA's

---

Investigation on    9/27/00    at    North Miami Beach,  Fla

File #

Date dictated    9/28/00

William Howe Grover
by    Kevin C. Rentzel,  Celeste Van Auken

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    ADAM TODD SILVERMAN                    , On  9/27/00         , Page    2

assistant at KING, and SILVERMAN's current girlfriend MELISSA MARIE HOFFPAUIR, worked as his assistant. SILVERMAN said he was paid on a commission basis only with KING.

SILVERMAN described a RUSSIAN businessman, OLEG KLETS, who arranged with SILVERMAN to sell and transport over 100 buses to the Eastern European country, KAZAKHSTAN. KLETS reportedly had a close connection to the Minister of Transportation in KAZAKHSTAN. The transaction had the potential to make a lot of money and SILVERMAN described the deal to purchase the buses at approximately $5,000 per bus, and then resell and transport them at a profit of between $5,000.00 - $8,500.00 per bus depending on the size and type. SILVERMAN said he could set this deal up but WERBA said SILVERMAN needed to put up fifteen thousand dollars towards the purchase of the first three buses. SILVERMAN said he had two people whom he convinced of the large profits which could be realized from this proposed sale. SILVERMAN said FRED MASSARO, the owner operator of BEACHSIDE MARIO's, (BSM), a pizza shop in Sunny Isles Florida would put up $10,000.00 and MONZER "MIKE" AGHA a cell phone store owner agreed to put up the $5,000.00 remaining balance. SILVERMAN said KLETS came to BSM and met with MASSARO and him regarding the proposed deal. MASSARO agreed to put up the money which he delivered to the KING GROUP several days later. SILVERMAN said MASSARO agreed to between a 3½ to a 4½ percent profit of the total sale deal for 100 buses. SILVERMAN said KLETS left the country soon after and SILVERMAN was unable to reach him. SILVERMAN attempted numerous times to make contact with him including calls and e-mails. KLETS did return to the United States and attempted to convince both MASSARO and SILVERMAN the deal could still be put together. SILVERMAN said MASSARO made him, SILVERMAN, responsible for the loan. SILVERMAN told KLETS that he had to take care of his own loan with MASSARO. SILVERMAN said MASSARO was very irate at both he and WERBA over his investment monies, and WERBA finally gave SILVERMAN a $7,000.00 KING GROUP check to be delivered to MASSARO. SILVERMAN said the remaining $3,000.00 balance was settled when KLETS agreed to leave MASSARO with his light blue Mazda SUV truck.

SILVERMAN advised he had previously met AGHA through the shared ownership of AGHA's two cell phone and beeper stores named LAZER SOUND located at 163rd Street and 15th Avenue, North Miami Beach, Florida and another beeper store located in the vicinity of 2551 E. Hallandale Beach Blvd, Hallandale, Florida. SILVERMAN said he had met AGHA through another associate MARTIN SISKIND.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of    ADAM TODD SILVERMAN                    , On  9/27/00    , Page    3

SILVERMAN said he had invested no monies in LAZER SOUND but had
instead brought over a "client base" to the business.

SILVERMAN said he also had an investment in the company
B&A PACK AND SHIP PLUS which he owned with his mother BARBARA
BECKER, 2401 South Ocean Drive, Apartment 2302, Hollywood, Florida
33019.

SILVERMAN said he met FRED MASSARO at a local bar called
NICK's AT NIGHT located at the Hawaiian Isle Hotel in Sunny Isles
Florida several years ago. SILVERMAN said he lived at the CENTURY
TOWERS located near the bar and would often stop by after work.
SILVERMAN said he met MASSARO and his girlfriend CAROL when they
would drop by the bar. SILVERMAN said MASSARO didn't drink but he
would socialize with several people at the bar. SILVERMAN said the
bar was owned and operated by an individual known to him as NICK
LNU (last name unknown) who was from Canada. SILVERMAN knew another
individual known to him as CARLOS LNU who would operate as the
music "DJ" for this bar and described him as tall, with long hair,
and he wore numerous gold chains. SILVERMAN said another friend of
CARLOS' was a Hispanic male named FRANK VALDES and described him as
having numerous gold teeth. SILVERMAN said VALDES introduced him to
MASSARO saying this was his, VALDES', good friend. SILVERMAN said
he had no knowledge whether MASSARO owned any interest in the bar.
SILVERMAN said MASSARO told him that he, MASSARO, knew SILVERMAN's
mother years ago in Brooklyn, New York.

SILVERMAN learned MASSARO owned the BSM pizza shop, and
SILVERMAN started frequenting his business and ordering pizza from
BSM. SILVERMAN said MASSARO arranged for him to start another
business at a check cashing store named CHECK CASHING UNLIMITED,
(CCU), located in Wilton Manors Florida. SILVERMAN said he and AGHA
had been having disagreements over their joint partnerships and
SILVERMAN was looking for a new business. SILVERMAN also said AGHA
was out of control with using drugs and SILVERMAN wanted to stay
away from him.

SILVERMAN said MASSARO drove him to the CCU store and
introduced him to the owners BRUCE CHIUSANO and IRVING WEISS.
SILVERMAN said he understood them to be partners in this store.
They agreed to allow him to set up a mailbox rental business in the
foyer area of the store, but he was not allowed to go into the rear
area of the store. SILVERMAN said he only had the business
operational for a period of about three months before he went out
of business. SILVERMAN said he did rent out some of the boxes and
specifically recalled three boxes rented to CHESTER POTASH who was

FD-302a (Rev. 10-6-95)

█████████████

Continuation of FD-302 of    ADAM TODD SILVERMAN                            , On  9/27/00    , Page    4

running the CCU for CHIUSANO and WEISS. SILVERMAN said he would see
MASSARO who would come up to CCU to either check on SILVERMAN or to
see CHIUSANO. SILVERMAN said on occasion he would also meet
CHIUSANO at the EINSTEIN BAGEL SHOP in Aventura early in the
mornings in order to get the keys from him for the CCU business.

SILVERNMAN said he met ARIEL HERNANDEZ in approximately
August or September, 1998 through a friend of his MIKE PELLITIER.
PELLITIER owned the "AVENTURA SERVICE CENTER" which was located
across from the Colonial Inn in an arcade plaza in Sunny Isles
Florida. SILVERMAN said one day he was in PELLITIER's business
when HERNANDEZ came in. PELLITIER introduced him and added that
HERNANDEZ had bounced several checks at his business. SILVERMAN
said he later learned from HERNANDEZ that he was working for
HERNANDEZ's brother who owned a religious store. SILVERMAN said he
also ran into HERNANDEZ at BSM. SILVERMAN said he never liked
HERNANDEZ as HERNANDEZ had originally attempted to purchase his
business, B&A PACK and SHIP. SILVERMAN said HERNANDEZ had provided
approximately four checks amounting to about seventeen thousand
dollars towards the purchase of this company. SILVERMAN said
HERNANDEZ gave them to one of SILVERMAN's employees, ROBERT LNU who
deposited them into the company's bank named FAMILY BANK located
off Hallandale Beach Boulevard, Hallandale, Florida. SILVERMAN
subsequently cashed these checks and later learned the checks were
bad. SILVERMAN said the name on the checks didn't correspond to
the check numbers and he had to make good on the checks. SILVERMAN
recalled the checks were somehow connected to the Princess Casino
gambling ship organization who then attempted to sue him,
SILVERMAN, for cashing these checks.

SILVERMAN recounted the events surrounding the murder of
JEANETTE SMITH in general terms in that he said he had been
drinking a great deal of wine and his recall was somewhat vague as
it pertains to the evening when he assisted HERNANDEZ move SMITH's
body and vehicle. SILVERMAN said he also had been distracted that
weekend in that he had just broken up with a former girlfriend and
they had an argument over a corvette. SILVERMAN said his
girlfriend's name was ROBIN LUTZ and she resided in apartment 104,
Sheridan Ocean Club, (SOC) Hollywood, Florida. SILVERMAN said she
had been going out with a friend of his named BOBBY LNU. SILVERMAN
said BOBBY LNU had been introduced to him by MARTIN SISKIND.
SILVERMAN said he became extremely upset upon seeing her at the SOC
with BOBBY LNU. SILVERMAN said he was at this time residing at the
CENTURY TOWERS, apartment 806 with his current girlfriend MELISSA
HOFFPAUIR. SILVERMAN said he recalls that on Saturday he slept in

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of _____ADAM TODD SILVERMAN_____ , On __9/27/00__ , Page __5__

till late in the morning with MELISSA and later in the afternoon he
went over to BSM. SILVERMAN said at approximately 4:00 PM he was
asked to go purchase some produce or food for BSM. SILVERMAN
recalled either MASSARO or CHARLIE MONICO had asked him to get the
food. SILVERMAN said he went to the Winn Dixie located in the
shopping plaza near "Shooters" restaurant and next to the
Intercoastal Waterway in North Miami Beach, Florida. SILVERMAN
recalls he bought a couple cases of soda and some chicken breasts.
SILVERMAN said when he did return to BSM he began drinking because
he was still upset over the argument with his former girlfriend.
SILVERMAN said he recalls possibly CAROL MOSHER who was MASSARO's
girlfriend served him up to 5, 6 or more glasses of red wine.
SILVERMAN also recalled that the cook, PETER LNU, and the waitress,
SHERRI LNU were also at BSM that night. SILVERMAN recalled that
ARIEL HERNANDEZ arrived at some point and asked him whether he
could use the Blue Mazda truck which MASSARO had given SILVERMAN to
use. SILVERMAN said HERNANDEZ said he needed help moving out of
his hotel room. SILVERMAN told HERNANDEZ he would have to ask
MASSARO because it wasn't SILVERMAN's truck to lend out. SILVERMAN
said HERNANDEZ got permission from MASSARO and he agreed to help
HERNANDEZ at his hotel. SILVERMAN said he was intoxicated but
accompanied HERNANDEZ as he drove over to his hotel room using the
truck. SILVERMAN said when they reached the hotel room HERNANDEZ
loaded the truck with several boxes, and possibly a bag. SILVERMAN
recalled one of the boxes was very heavy but HERNANDEZ said he
could move it himself. SILVERMAN said he didn't entirely enter the
hotel room but rather remained in the doorway of the room.
SILVERMAN said he did not notice anything unusual in the room.
After HERNANDEZ loaded the truck he showed SILVERMAN another
vehicle which he described as his "new" vehicle. SILVERMAN said he
was under the influence of the wine he had consumed and probably
should not have been driving. SILVERMAN said he nevertheless
followed HERNANDEZ to an unrecalled residential area of Surfside,
Florida and waited in the truck until HERNANDEZ parked the car.
SILVERMAN recalled HERNANDEZ parked near a construction site and in
front of a house. SILVERMAN said HERNANDEZ then drove the truck
and dropped him off at his apartment at CENTURY TOWERS, Sunny
Isles, Florida. SILVERMAN said he did not remove anything from the
car which HERNANDEZ drove and parked that evening.

       SILVERMAN recalled MELISSA was at the apartment and they
remained there the entire evening. SILVERMAN recalled they ordered
pizza from BSM after he returned home. SILVERMAN recalled the time
was approximately 8:00 or 9:00 PM. SILVERMAN could not recall who
delivered the pizza.

FD-302a (Rev. 10-6-95)



Continuation of FD-302 of ___ADAM TODD SILVERMAN_____ , On _9/27/00_____ , Page ___6____

       SILVERMAN said the next day, Sunday, he and Melissa slept in and he believes he called MASSARO in order to get the truck back from HERNANDEZ.